UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

13 MAR 29 PM 2: 18

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>NATIVIDAD LARA CERVANTES,<br>  aka "Nate Cervantes,"<br><br>        Defendant. | Case No.<br><br>**COMPLAINT**<br><br>Title 18, United States Code, Section 201(b)(2) – Bribery<br><br>'13 MJ 1269 |

The undersigned complainant, being duly sworn, states:

On or about March 26–28, 2013, in the Southern District of California, NATIVIDAD LARA CERVANTES, being a public official, did directly and indirectly corruptly demand, seek, receive, accept and agree to receive $40,000 in cash in return for being influenced in the performance of an official act and being induced to do and omit to do any act in violation of his official duty, namely, assisting in obtaining for a contractor a new $4 million flooring contract at Camp Pendleton.

And the complainant further states that this Complaint is based upon the attached statement of facts, which is incorporated herein by reference.

                                              GERALD COOK
                                              Special Agent, FBI

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS 29 DAY OF MARCH, 2013.

                                              BERNARD G. SKOMAL
                                              UNITED STATES MAGISTRATE JUDGE

## STATEMENT OF PROBABLE CAUSE

### A. Introduction

Natividad Lara CERVANTES, aka Nate Cervantes, is currently a U.S. Department of Defense employee and the Supervisor for Construction and Service Contracts Inspection Branch at Camp Pendleton. Based on information from cooperating witnesses and a video- and audio-recorded conversations, there is probable cause to conclude that CERVANTES is engaged in receiving bribes and other crimes related to his management of construction contracts at Camp Pendleton.

### B. Tips that CERVANTES is Extorting Bribes at Camp Pendleton

#### (1) CW-1's Tips About CERVANTES

On November 15, 2012, a cooperating witness (CW-1)[1] told me that CERVANTES was extorting bribes in his role as Facilities Support Contracts Manager at Camp Pendleton. During the meeting with CW-1, CW-1 related that in August 2008, the business that s/he was working for was awarded a prime contract at Camp Pendleton. In September 2008, CERVANTES told CW-1 that he was instrumental in getting that contract awarded to CW-1's business and that he needed $5,000. CW-1 later paid the $5,000 to CERVANTES at a restaurant in San Diego. Between September 2008 and late 2010, CW-1 made about four $5,000 cash payments to CERVANTES — for a total of about $20,000 over two years — each time after being contacted by CERVANTES with a request for the money.

During this same November 15, 2012 interview, CW-1 related that on August 2011, CW-1's business (a different business) was awarded a prime contract for work at Camp Pendleton. Within 30 days, CERVANTES called CW-1 and again indicated he had been instrumental in awarding CW-1's business the contract. CW-1 replied that CW-1 knew CERVANTES was not directly involved in the awarding of the contract. CERVANTES responded that he had the ability to affect how CW-1's project went and he could make the project go smoothly or badly for CW-1's business. CERVANTES said he normally demands 3% of the value of the contract, but CW-1 said that CW-1 could not pay that much. CERVANTES told CW-1 to give him what CW-1 could pay. Over the next two months, CW-1 personally delivered two $2,500 cash payments to CERVANTES, for a total of $5,000.

On January 9, 2013, CW-1 told me additional information about CERVANTES. According

---

[1] A March 26, 2013 criminal history query revealed that CW-1 has no known criminal record. CW-1 is under investigation for engaging in kickback schemes, false statements on federal forms, false statements to the Small Business Administration, and other crimes. CW-1's motivation for cooperating is to receive more lenient treatment in potential future criminal proceedings. CW-1 has provided accurate and reliable information about the criminal activities of others.

2

to CW-1, CERVANTES once told him/her, "I am referred to as the 'Godfather' at Camp Pendleton." CERVANTES controls the "laydown area" at Camp Pendleton, where contractors set up their trailers, and specifically determines which contractors get spots in the "laydown area." One of CW-1's business associates (Person A),[2] a prime contractor with whom CW-1 worked, also told CW-1 about Person A's cash payments to CERVANTES. CW-1 believes Person A was paying CERVANTES to get high performance evaluations for projects at Camp Pendleton. While CW-1 was working with Person A, their business received a dozen or more "Outstanding" evaluations at Camp Pendleton in a two-year period.

According to CW-1, at one point, CERVANTES called CW-1 and asked that CW-1's and Person A's business hire CERVANTES' granddaughter. As a result, their business did hire CERVANTES' granddaughter, who worked as a full-time administrative assistant for the business between 2009 and 2010, for between $16 and $17 per hour. The granddaughter was not a dependable employee, so CW-1 eventually called CERVANTES to ask CERVANTES' permission to terminate the granddaughter. CERVANTES replied, "Do what you have to do." CW-1 also told me that at some point, CERVANTES also called CW-1 to obtain free work on CERVANTES' downtown San Diego condominium. CW-1 asked a sub-contractor (CW-2)[3] to do the repairs at CERVANTES' condominium, and CW-1 arranged to pay for CW-2's work, so that there would be no cost to CERVANTES.

Agents have confirmed that CW-1 handled multiple contracts or task orders at Camp Pendleton during the period of time CW-1 said that he made cash payments to CERVANTES. Business records and Department of Defense files showed that these businesses were awarded over fifteen contracts or task orders at Camp Pendleton since 2008. CERVANTES' signature appears on multiple documents confirming work done on contracts by Person A's company under the direction of CW-1.

(2) **CW-2's Confirmation of Free Work on CERVANTES' Condo**

On December 4, 2012, CW-2 told me that CW-2 performed work on a condominium for Nate CERVANTES, who CW-2 believed worked at Camp Pendleton. CW-2 also told me that CERVANTES could influence whether CW-1's business got contracts, so CW-1 and CW-2 needed to fix CERVANTES' house and that CW-1 would take care of the bill. According to CW-2, the

---

[2] Person A is under investigation for engaging in kickback schemes and other crimes. I have spoken to Person A in the past, and Person A was untruthful with me, in that Person A did not admit the crimes that Person A had been engaged in.

[3] A March 26, 2013 criminal history query revealed that CW-2 has no known criminal record. CW-2 is under investigation for engaging in kickback schemes and other crimes. CW-2's motivation for cooperating is to receive more lenient treatment in potential future criminal proceedings. CW-2 has provided accurate and reliable information about the criminal activities of others.

entire project took two to three weeks. CW-2 initially believed the work was completed in 2012, but when I showed CW-2 a subcontractor daily report dated January 28, 2011, CW-2 confirmed that this report related to the remodel of CERVANTES' condominium. CW-2 believed the work was done in late January or early February 2011.

During this same conversation, CW-1 told me that s/he told CW-2 that CW-2 would get more sub-contracting work if CW-2 did the remodel of CERVANTES' condominium at cost. The job cost CW-2 $5,823.90, which is the amount that CW-2 was paid. (In actuality, it appears CW-2 was paid $5,820.) Normally, CW-2 would have charged 20% more than that to cover overhead expenses. CW-2 believed CW-1 authorized this payment through a business associated with CW-1 and Person A. Specifically, CW-2 believed the payment was authorized through a change order for another project, and CW-2 believed CW-1 was taking money from one government project to pay for the remodel of CERVANTES' condominium.

A review of business records seized from CW-2's business in November 2012 revealed a Subcontractor Daily Report showing that CW-2's business did remodeling-type work at "Palmero, Downtown - Nate Cervantes" on January 28, 2011. A review of business records seized, pursuant to a court-authorized search warrant, from businesses associated with CW-1 showed that one of those businesses paid a check, dated February 17, 2011, to CW-2's business for $5,820. I have reviewed business records seized from these businesses as well as bank records for these businesses for 2011, and there is no evidence that CERVANTES ever paid any money to these businesses for the work done on CERVANTES' condominium.

### C.  CERVANTES Agrees to $40,000 Bribe from CW-1

On March 26, 2013, during a consensually video- and audio-recorded conversation, CW-1 met CERVANTES at CERVANTES' OFFICE and agreed to pay CERVANTES a $40,000 bribe in exchange for CERVANTES' assistance obtaining a new $4 million contract at Camp Pendleton, with $20,000 to be paid on March 28, 2013, and $20,000 to be paid upon the awarding of the contract. Before the meeting, agents outfitted CW-1 with a buttonhole audio/video-recording device, and agents retrieved the recording device after the meeting. Based on my review of the recording, the following conversation transpired between CERVANTES and CW-1 at CERVANTES' OFFICE (with my interpretation of any coded or ambiguous speech in brackets or parentheses):

CW-1 discussed the fact that federal agents searched CW-1's business in November 2012, but that CERVANTES did not need to worry about his criminal activities being exposed. CW-1 said that the government tries "to scare you into talking about, saying 'Oh yeah, I admit to this, I admit to this.' Pretty soon you are admitting to three to four years." CERVANTES replied, "Yeah. I know." CW-1 then assured CERVANTES that he would not tell law enforcement about their prior criminal acts, saying, "And when it comes down to it, whatever happens, you know, say they do want to talk to me a little later, I say nothing about our business before, what we did." CERVANTES replied, "Right." CW-1 later said, "They don't have anything, and that's the beauty of it. When we did everything in cash, nothing, nothing, unless you said something to someone, you know, there is

4

no paper trail. . . . But I can assure you, nothing, because they ain't got shit on me, which means they will never have shit on you."

Later, CW-1 discussed the free work on CERVANTES' condominium in 2011. CW-1 said, "With my subcontractors, okay, maybe I accepted a few favors [kickbacks] from them. Maybe they, you know, Nate, sometimes they remodeled, they remodeled my house just like we remodeled your condo, but . . . ." CERVANTES said, "That's business." CW-1 replied, "But that's little stuff, little stuff." Later, CW-1 reiterated, "Like with you, you have, say, when I fixed your condo, okay, big deal, big deal, first of all, that's never going to go there, but that's just something I did for you. . ."

At one point, CW-1 asked, "Now that door -- they [other employees in the building] can't hear on the other side, right?" CERVANTES replied, "No, that's why I have the radio on." (The radio was in fact on at that time.)

At the beginning of their conversation, CW-1 asked for CERVANTES' help getting a $4 million flooring contract at Camp Pendleton, which was to be awarded in about 45 days. CW-1 asked, "What can you do for me to just tell her [the awarding official] to go [to award the contract to CW-1's business]?" CERVANTES then placed a call to the awarding official and told her: "I was just calling to remind you, okay, we got 45 days to do that back-to-back award on the flooring to [CW-1's business]. I am putting that on my calendar, cuz." The awarding official can be overheard replying that the award was not "set in concrete." CERVANTES responded, "Okay, but you'll, you'll do your magic, right?" The awarding official replied that she would do the best she can. After CERVANTES hung up, CW-1 said, "Thank you, Nate." And CERVANTES replied, "There you go."

Later, CERVANTES and CW-1 discussed the bribe amount for CERVANTES' assistance securing the new $4 million flooring contract. CW-1 said, "But four mill [$4 million] is a lot of money, you know, the contract [the new $4 million contract]. If we can do, I'll even, shoot, I can even do like maybe 1% [of the contract value]. So, that's forty [$40,000]." CERVANTES asked CW-1 when CW-1 was usually free, and they discussed a plan to meet at the Churchill Cigar Lounge on Miramar Road.

They later decided that CW-1 would pay $20,000 in the near future and $20,000 after the contract was awarded in about 45 days. CW-1 said, "What I can do for you is 20 [$20,000], . . . . then 20 [$20,000] on the award." CERVANTES replied, "Um-hm." CW-1 said, "Forty-five days, right? Are we good with that date?" CERVANTES replied, "Yeah, I think so." CERVANTES asked if CW-1 could meet on "Thursday," and then they agreed to meet at 4:15 p.m. on Thursday, March 28, 2013 (at the previously discussed location of the Churchill Cigar Lounge). At the end of the conversation, CW-1 stated that CW-1 would bring the first half of the payment, or $20,000, to their Thursday meeting at the Churchill Cigar Lounge. Initially, CW-1 asked, "Just half [$20,000], right?" CERVANTES replied, "Well, let's talk about it when we get over there." Later, CW-1 stated that CW-1 was going to "bring half [$20,000]" to the meeting, and CERVANTES responded, "Okay."

5

### D. CERVANTES Accepts a Bribe from CW-1

On March 28, 2013, CW-1 met CERVANTES at the Churchill Cigar Lounge at 7094 Miramar Road, San Diego, California. During an approximately one hour and forty-five-minute meeting, which was partially video- and audio-recorded, CW-1 and CERVANTES discussed, among other things, how CW-1 would pay CERVANTES the $40,000. CERVANTES asked about the source of the funds, expressing concern about whether it could be traced. CW-1 assured CERVANTES that he was withdrawing cash from a personal—not business—account. CW-1 said that he had $10,000 with him. CERVANTES and CW-1 then discussed the schedule for payment of the remaining $30,000.

CW-1 and CERVANTES then left the Churchill Cigar Lounge and went to CW-1's SUV, which was parked outside. According to CW-1, once they were inside the SUV, s/he reached under his/her seat and retrieved a manila envelope. The manila envelope contained three bundles of cash totaling $10,000: two $2,000 bundles, comprised of twenty dollar bills, each wrapped in a violet and white band; and one $6,000 bundle, comprised of sixty one hundred dollar bills, wrapped in an envelope decorated with a garden scene. According CW-1, CERVANTES said something to the effect of the envelope being large. CW-1 then folded the manila envelope in half and handed it to CERVANTES.

CW-1 and CERVANTES then got out of CW-1's SUV and proceeded to walk to CERVANTES's car. At this point, federal agents approached CW-1 and CERVANTES and ordered them to put their hands in the air. CW-1 and CERVANTES did so; CERVANTES threw the manila envelope on the ground. Agents later identified the envelope as containing the bundles of cash as described immediately above.

Executed on March 29, 2013 at 1:30p.

GERALD COOK
Special Agent, FBI

On the basis of the facts presented in the probable cause statement, I find probable cause to believe that the defendant named in this probable cause statement committed the offense on March 26–28, 2013, in violation of Title 18, United States Code, Section 201(b)(2).

BERNARD G. SKOMAL
UNITED STATES MAGISTRATE JUDGE

6